# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

BURTON KIRSTEN,              )

                              )

             Plaintiff,      )

                              )

        vs.                  )      Case No.  2:22-cv-04109-MDH

                              )

CAPE ROYALE AT SKI HARBOR    )

CONDOMINIUM OWNERS        )

ASSOCIATION, INC.,           )

                              )

            Defendant.    )

 

## **AMENDED SUGGESTIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT UNDER RULE 56**

## **AND**

## **REQUEST FOR ORAL ARGUMENT**

03845909 v1

# TABLE OF CONTENTS

I.      INTRODUCTION…………………………………………………………...1

II.     COUNTER-STATEMENT OF FACTS …………………………………………..…..1

III.    STANDARD OF REVIEW …………………………………………………………8

IV.     LEGAL DISCUSSION …………………………………………………………...8

        A.      The boat well is a facility in connection with the condominium unit under
                the FHA ……………………………………………..…………………………...8

        B.      Plaintiff has stated a claim for Intentional Infliction of Emotional Distress …….14

V.      CONCLUSION …………………………………………………………………15

## <u>TABLE OF AUTHORITIES</u>

<u>Cases:</u>

*City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 729 (1995)…………………...…9, 11, 12

*Community Housing Trust v. Department of Consumer and Regulatory Affairs*,
    257 F. Supp. 2d 208, 221 (D.D.C. 2003) ……………………………………………………...11

*Dunham v City of O'Fallon, MO.*, 954 F.Supp 1256, 1262; 19 A.D.D. 1035
    (E. D. Missouri 1996) …………………………………………………………………………...14

*Lloyd v. Housing Authority of City of Kirksville*, 58 F.3d 398, 399-400 (8th Cir. 1995) …………9

*Nevels v. Western World Ins. Co., Inc.*, 359 F. Supp. 2d. 1110, 1119 (W.D. Wash. 2004) ………11

*Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1234
    (U.S.D.C. of Columbia 1997) …………………………………………………………………...11

*Shapiro v. Cadman Towners, Inc.*, 844 F.Supp 116, 118; 4 A.D.D. 595
    (E.D. New York 1994)…………………………………………………………………………10, 11

*Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 333 (2d Cir. 1995) ………………………………9

*Trafficante v. Metropolitan Life Inc., Co.*, 409 U.S. 205, 209; 93 S. Ct. 364 (1972) ……………12

*United States v. California Mobile Home Park Management Co.*, 29 F.3d 1413,
    1416-17 (9th Cir. 1994) …………………………………………………………………………9

<u>Statutes:</u>

42 U.S.C. § 3601 ………………………………………………………………………………11

42 U.S.C. 3602(i)(1) ……………………………………………………………………………9

42 U.S.C. § 3602(b)(f)(h) ………………………………………………………………………9

42 USC 3604(f)(2)…………...……………………………………………………..9, 10, 12, 13

42 U.S.C. § 3604(f)(1) …………………………………………………………………………9

42 U.S.C. § 3604(f)(3)(a) ………………………………………………………………………10

42 U.S.C. § 3604(f)(3)(B) ………………………………………………………………………9

## I.     INTRODUCTION

Plaintiff filed a complaint against Defendant because Defendant has violated the federal Fair Housing Act, 42 USC 3601, *et seq.* ("FHA") by refusing to make, or even consider, any reasonable accommodation for Plaintiff to have equal use and enjoyment of his boat well, a facility in connection with his condo unit.

As discussed in detail below, Defendant's position is reliant on two flawed expert reports. The first is from Douglas Pluth ("Pluth").  Pluth admitted that the report initially used by Defendant was falsified, and used without his knowledge or consent.  It has no relation to this case whatsoever.

Second, after Pluth defected, Defendant hired Chad Williams ("Williams"), a paid expert who lives in a court room, to render an opinion.  Williams report is severely flawed.  Williams evaluated the subject boat cover on a center console boat, which is a completely different design from Plaintiff's boat, which is a catamaran.  William's entire report is irrelevant to this case.

What is glaring at this point in the case is that Defendant's board does not like the Plaintiff because he has requested two accommodations: 1) a handrail in the staircase so he can traverse the stairs, and 2) the Boat Cover.  Since this litigation, Defendant's board has defamed and disparaged Plaintiff, causing other residents to become hostile toward Plaintiff.  Clearly, the goal is to push Plaintiff out of the condo complex, simply because he requires some assistance.  Summary disposition is warranted in favor of Plaintiff and Plaintiff should be awarded fees and costs.

## II.     STATEMENT OF FACTS

Plaintiff, Burton Kirsten ("Plaintiff" or "Kirsten"), filed a Complaint alleging that Defendant, Cape Royale at Ski Harbor Condominium Owners Association, Inc. ("Defendant" or

"Cape Royale"), has violated the FHA, arising out of the Defendant's refusal to make a reasonable accommodation under the FHA for Kirsten's disability. (**Exhibit A:** Complaint).

A. **Plaintiff Kirsten suffers from CMT, which severely affects his mobility.**

Critical to this matter, in 1992, Plaintiff Kirsten was diagnosed with Charcot Marie Tooth ("CMT"). (**Exhibit A; Exhibit B**: Kirsten Affidavit). According to the National Institute of Neurological Disorders and Stroke ("NIH"), CMT is described as follows:

> … disorder that cause damage to the peripheral nerves—the nerves that transmit information and signals from the brain and spinal cord to and from the rest of the body… . CMT can also directly affect the nerves that control the muscles. **Progressive muscle weakness** typically becomes noticeable in adolescence or early adulthood… . Because longer nerves are affected first, symptoms usually begin in the feet and lower legs and then can **affect the fingers, hands, and arms**. Most individuals with CMT have some amount of physical disability… .[1]

Kirsten is not in the early-stages of CMT; he is in advanced stages and the symptoms are severe. (**Exhibit A; Exhibit B**). CMT affects Plaintiff's sensory and motor nerves (nerves that trigger an impulse for a muscle to contract) in the **arms, hands, legs, and feet**.[2] This causes weakness and/or paralysis of limbs, and other significant limitations.[3] CMT severely affects Plaintiff Kirsten's mobility and it has crippled Kirsten's hands and feet. (**Exhibit A; Exhibit B**). Plaintiff Kirsten must wear braces on both legs just to walk; he cannot walk without the braces. (**Exhibit A; Exhibit B**). This severely limits Plaintiff Kirsten's ability to traverse tight spaces, slippery spaces, and uneven structures, such as boats, boat docks, and boat wells (at issue in this case). (**Exhibit A; Exhibit B**). The effect of CMT on Plaintiff Kirsten's hands make it difficult

---

[1] https://www.ninds.nih.gov/health-information/patient-caregiver-education/fact-sheets/charcot-marie-tooth-disease-fact-sheet.
[2] *Id.*
[3] *Id.*

for Kirsten to grip and apply force to objects, such as boat covers (also at issue in this case). (**Exhibit A; Exhibit B**). Plaintiff Kirsten requires a reasonable accommodation from Defendant to allow for equal use and enjoyment of his boat well.

### B. Plaintiff Kirsten's condo unit and request for an accommodation from Defendant

In November 2020, Plaintiff Kirsten purchased a condominium unit commonly known as 4499 Ski Dr., Unit 201, Osage Beach, MO 65065 (the "Unit"), which is located in the Cape Royale at Ski Harbor condominium complex ("Cape Royale"). (**Exhibit A; Exhibit B**). Plaintiff Kirsten purchased the Unit because he enjoys spending the Summer months in Missouri and on the Lake of the Ozarks ("LOTO"). (**Exhibit A; Exhibit B**). When Plaintiff Kirsten purchased his Unit, it was critical that the Unit came with a boat well to store Plaintiff's boat, "Jet," during the boating months. (**Exhibit A; Exhibit B**). Jet is a 46' Outer limits powerboat, which is **a <u>catamaran style boat</u>**, depicted below:



Jet is stored on a lift in the boat well that came with the Unit. (**Exhibit A; Exhibit B**). Plaintiff's boat well is a facility that is part of the Cape Royale condominium complex, and more specifically, part of Plaintiff's Unit. Plaintiff Kirsten would not have purchased his Unit if it did not come with the boat well. (**Exhibit A; Exhibit B**).

As a consequence of CMT, Plaintiff Kirsten cannot cover Jet with a standard boat cover like people without a debilitating disease. (**Exhibit B**). As a reasonable accommodation, Kirsten installed a custom boat cover (the "Boat Cover") in his boat well so that he can use the boat well for its intended purpose – to store Jet while not in use. (**Exhibit A; Exhibit B**). A photo of the Boat Cover in Plaintiff's boat well is depicted below:



Plaintiff's Boat Cover is custom designed and installed by Marine Concepts. (**Exhibit J**: Kent Report). The Boat Cover works on a track system that allows Plaintiff to simply walk along the dock and pull the cover onto the boat. (**Exhibit B**). The Boat Cover has 3 design patents that prevent the cover from parachuting or sailing, which is a concern with other hanging covers without the patent. (**Exhibit J**). Plaintiff specifically purchased the patented Marine Concept Boat Cover to avoid any risk or harm to the dock.

It is important to note that all other residents of Cape Royale cover their boats while in the boat well. A sample of other Cape Royale resident's covered boats are depicted below:



Plaintiff Kirsten should be afforded **this same opportunity** as the other residents of Cape Royale. Instead, Defendant has chosen to discriminate against Plaintiff Kirsten and prohibit Kirsten's use of the Boat Cover.

> **C.**     **Defendant's rejected Plaintiff's request for an accommodation to use the Boat Cover under the guise of a <u>falsified and manipulated</u> report from Douglas Pluth.**

On or about April 26, 2022, Plaintiff Kirsten received an email notice from Lori Priest ("Priest") of Professional Management Group, Inc. ("PMG"), the property manager and agent for Defendant Cape Royale, alleging that Plaintiff Kirsten's Boat Cover violates Cape Royale's Rules and Regulations, and must be removed. (**Exhibit C**: Priest Emails). Defendant, through Priest, stated that the reason Plaintiff Kirsten may not use the Boat Cover is because other residents will want the same cover, which would become harmful to the boat dock structure:

> *"These types of covers, if they were allowed and **<u>several people on one dock</u>** had them installed, cause issues with the dock due to the wind. It would even require additional cables and anchors to be installed."*

(**Exhibit C**). Defendant's reasoning is unsupported and violates the FHA.

Plaintiff Kirsten and his wife, Yvette, gave an immediate response to Defendant that Plaintiff Kirsten suffers from a medical condition, CMT, and the adverse effects that CMT has on Kirsten's mobility:

> *… My husband is handicapped. He has a neurological disorder that cripples his hands and feet. He does not have full use of his hands… Our boat is 45' long and my husband… cannot physically put a cover on, So he had an automatic one installed… . **<u>My husband was crushed when you told him it had to come down. Burton cannot do the normal things that bring us joy. Boating is the one thing he can do that makes him happy and makes him feel normal. We do things daily, like tie our own shoes, and take for granted that he can't do. Please don't take this away from him</u>**… .*

(**Exhibit D:** Yvette Response). Plaintiff Kirsten and Yvette stressed the necessity of the Boat Cover for Kirsten to be able to use and enjoy the boat dock and well, the same as the other residents of Cape Royale; and Plaintiff paid for the accommodation on his own. (**Exhibit B**).

The Defendant responded to Plaintiff and Yvette with complete rejection and without any offer of a reasonable accommodation:

> *"I sent your message to the Board members and they all agreed that the boat cover must be removed. It is a violation of the rules for the Association and, again, **if several people on one dock had them, it would become an issue**."*

(**Exhibit E**: Priest Response Email). Defendant contended at that time, that its position was based-on an expert report from a ***"paid expert"*** retained by Defendant, Doug Pluth. (**Exhibit E**). Priest confirmed this again at her deposition:

> *Q:      Who is the expert you are referring to in this email?*
>
> *...*
>
> *Q:      Mr. Pluth?*
>
> *A:      Yes.*

(**Exhibit F**: Priest Deposition Transcript, pp 32-33). Further, Defendant produced in discovery a one paragraph report from Pluth stating that *"even though there a few of these covers in use at this time, I strongly recommend that additional suspended covers not be allowed."* (**Exhibit G**: Pluth Report). Defendant's prior counsel authored a letter to Plaintiff reiterating that Defendant's expert, Pluth, opined that the Boat Cover will harm the dock and Defendant actually threatened to fine Plaintiff $100 per day. (**Exhibit H**: Defendant's 6/3/22 Letter). **This was a completely false position, as stated by Pluth himself**.

Pluth's report was highly suspect as it lacked any analysis. Pluth himself testified that he was never paid or retained by the Defendant; he never inspected this Boat Cover or dock at issue

in this case; that the report used by Defendant has no relevance to this case; and that the **report**

**was used without Pluth's knowledge and consent**:

> Q: Okay. How did you become involved in this matter?
>
> A: Unknowingly, someone took a photograph, apparently, of a letter that I wrote for a very in-depth report analysis on a completely different marina, and there is a paragraph where I addressed the use of these big hanging type curtain boat covers...
>
> So that little excerpt of my opinion... was passed along... **_without my knowledge, without my permission, and it had nothing to do with the case whatsoever_**.
>
> Q: Okay. ... From what I am hearing from you, you didn't authorize anybody from the HOA to use or produce that report in regard to this case. Is that correct?
>
> A: That is correct.
>
> Q: Okay. Did you do any type of investigation or inspection of the boat docks or covers that are at issue in this case?
>
> A: No.

(**Exhibit I**: Pluth Transcript, pp 7-8).

Pluth continued that he has never even spoken to Priest or Defendant's prior counsel, both of whom referenced reliance on Pluth's opinion in their correspondence to Plaintiff in rejecting the Boat Cover accommodation:

> Q: Do you have any type of relationship with her (Priest)?
>
> A: No.

(**Exhibit I**, p 13).

> Q: Do you know an attorney named Ryan Bertels?
>
> A: No ... .

(**Exhibit I**, p 15).

Pluth continued that the report and analysis he conducted was not in reference to a Marine Concept boat cover, the type of Boat Cover at issue in this case. (**Exhibit I**, p 10). Pluth is aware that the Marine Concept cover is a form fitting cover, unlike the large rectangular hanging covers. (**Exhibit I**, pp 10-11). Pluth testified that in his 30 years of living on Lake of the Ozark and doing engineering work, he has never heard of a Marine Concept cover damaging a boat dock structure. (**Exhibit I**, pp 12-13).

Pluth's testimony is important because it proves the Defendant manipulated and falsified a report and used it to prohibit Plaintiff's Boat Cover, when that report had no relation to the Boat Cover at issue in this case whatsoever. And equally egregious, Defendant untruthfully told Plaintiff that its position was supported by a *"paid expert,"* which was blatantly false. (**Exhibit E; Exhibit H; Exhibit I,** pp 7-8, 13, 15). It is now clear why Defendant went to great lengths and filed a motion in effort to prohibit Pluth's deposition – Defendant refused a reasonable accommodation to Plaintiff with a fraudulent report.

### D. Three experts have opined that the Boat Cover will not harm the dock structure.

The Boat Cover does not harm or jeopardize the dock structure. The Boat Cover is tied and rolled-up when not in use, and applies only 130lbs of weight onto the base of the dock. (**Exhibit B; Exhibit J**: Kent Report**; Exhibit K**: Kent Transcript, p 31). When the Boat Cover is in use, it lays snuggly affixed to the hull of the boat (Jet), and does not cause any stress (or nominal stress) to the boat dock structure. (**Exhibit B; Exhibit J; Exhibit K**, pp 14, 25, 36, 41, 59, 60; **Exhibit M**: Carter Reports). Defendant lacks any credible support to the contrary.

Plaintiff retained Randy Kent ("Kent") as an expert in this matter. Kent, a former principal of Marine Concepts who designed the subject Boat Cover and track system, authored a report in this matter opining that the Boat Cover will not cause a parachute (aka sail) affect or damage the

dock structure. (**Exhibit J**). Kent provided the patents for the windless system on the Boat Cover that prevent the parachute affect that Defendant was initially concerned about. (**Exhibit J**). A summary of Kent's testimony/opinion is a follows:

- Marine Concepts has installed over 5,000 of these Boat Covers on similar dock structures and not one has damaged a dock structure. (**Exhibit** K, p 58).

- 35 Marine Concept Boat Covers were tested extensively through Hurricane winds. The roofs on those docks blew off and the Marine Concept Boat Covers were still sitting affixed to the boat and track systems without causing any damage. (**Exhibit J; Exhibit K,** p 42, 44-45).

- The patent on the Boat Cover is an open wind system that does not create any kind of parachute or sail effect. (**Exhibit J; Exhibit K**, pp 14, 25, 41, 59).

- The Boat Cover weighs 130lbs. When the Boat Cover is not on the boat, it is the equivalent of a child standing on the dock. (**Exhibit K**, p 31).

- When the Boat Cover is suspended on the boat, the weight of the cover is supported by the boat, and it adds only a load of .19 PSF to the roof, which the equivalent of a bird sitting on the roof. (**Exhibit J; Exhibit K**, p 34, 36).

- The Boat Cover system is mounted to a false ceiling that avoids stress on the roof of the dock structure. (**Exhibit K**, p 60).

It is indisputable that these covers do not parachute or damage dock structures. There are no legitimate proofs to the contrary.

Plaintiff retained William Carter ("Carter") as a structural engineering expert in this matter. Carter is a licensed structural engineer in Missouri and Kansas since 1974, 49 years. (**Exhibit L**, p 8). Carter has extensive experience in determining wind load capacities for various structures, including roofs. (**Exhibit L**, pp 69-70). Carter inspected the subject boat dock structure, the Boat Cover, and the boat – Jet, and rendered an opinion that this Boat Cover on this Boat (Jet) will not parachute or harm Defendant's dock structure. (**Exhibit M**). Carter actually reverse engineered

the dock structure with the Boat Cover installed on Jet to reach his opinion.  (**Exhibit M**).  **Carter possesses of photograph of the Boat Cover on a catamaran boat like Jet, which he relied on in his opinion**[4]:



(**Exhibit M**).  Carter opined in-relevant part as follows:

- The weight of the Boat Cover itself is supported by the hull of the boat, not the roof or dock structure.

- The straps, bungees, and rollers for the Boat Cover add 13.98 pounds of weight on the dock structure.

- The roof structure for the subject dock is capable of handling a snow load of 9,600 pounds.

- The Boat Cover will add only imperceptible wind loads to the dock structure.

(**Exhibit M**).

Plaintiff retained Matt Hasselbring, a certified dock builder in Missouri, who opined as follows:

- Hasselbring is a certified dock builder who worked for Galvafoam docks, the manufacturer of the dock structure in this case, and who possesses personal knowledge of the subject dock construction and design.  (**Exhibit N**: Hasselbring Transcript, pp 13, 23-24, 51-52).

- Hasselbring has personal knowledge of 100s of Marine Concept Boat Covers on boats and docks on Lake of Ozarks.  (**Exhibit N**, p 21).

---

[4] As will be discussed below, Defendant's expert did not even evaluate the subject Boat Cover on the correct style of boat, which is a glaring deficiency with his opinion.

- The Boat Cover has adequate area above the cover itself for wind flow due to its aerodynamic shape and does not present detrimental loads on the dock structure. (**Exhibit O**: Hasselbring Report).

- Worst case scenario, if there were wind loads on the Boat Cover strong enough to damage the dock, the system is designed for the bungee straps to fail to avoid damage to the dock. (**Exhibit O**).

Taken together, the designer and manufacturer of the Boat Cover, who has installed over 5,000 covers on similar docks at issue in this case, who has put the Boat Cover through extensive real-life testing, has opined that the Boat Cover will not harm the dock; a structural engineer, Carter, with 49 years of experience in determining wind loads on structures, has opined that this Boat Cover, **on this boat (a catamaran)**, will not harm the dock structure; and Hasselbring, the only certified dock builder and witness in this case with personal knowledge of how the subject dock was built, and who also has personal knowledge of the design and use of this Boat Cover, has opined that the Boat Cover will not harm the dock structure.

Also, as admitted by Defendant, prior to this Court's ruling on the injunction, the Boat Cover was installed for 3 to 4 months and never caused any damage to the dock structure. (**Exhibit P**: Porter Transcript, pp 43-44).

This is overwhelming testimony and proves that the Boat Cover will not harm the dock.

**E.      Defendant's own representatives' testimony proves Defendant's position to be frivolous, and Defendant's expert report is severely flawed as the expert analyzed the cover on the wrong style of boat.**

As discussed above in Section C, Defendant originally took the position that the Boat Cover must be removed because it overstressed the base of the dock and would require additional cables and anchors to be installed. (**Exhibit D**). As also discussed above, Plaintiff proved that this was a false position asserted by Defendant under the guise of a manipulated report that has no relevance to this matter. (**Exhibit I**, pp 7-8, 10-11). Defendant's position was illogical. The Boat Cover

weighs 130lbs; when the Boat Cover is not on the boat, it applies 130lbs of weight onto the dock, equal to a small child standing on the dock. (**Exhibit K**, p 31). When the Boat Cover is on the boat, there is nominal load added to the dock structure because the hull of the boat supports the cover (**see photos above**). (**Exhibit J; Exhibit K**, p 34, 36; **Exhibit M; Exhibit O).** Defendant lacks any rational basis to prohibit the Boat Cover, and Defendant's own representatives destroyed Defendant's credibility.

The subject boat dock has 20 boat wells (**Exhibit F**, p 13; **Exhibit M; Exhibit O**). Defendant's board President, Terry Porter, testified in relevant-part, as follows:

- Several boats are on hoists that are affixed to the dock structure and uses to lift the boats in and out of the water. (**Exhibit P**, p 22-25).

- Boats on the hoists are tied with ropes to the dock structure beams (example photo below). (**Exhibit P**, p 22).



- Defendant allows boats up to 50 feet long sit in the water while tied-up to the dock. (**Exhibit P**, p 17).

- On any given day, you could have 15 to 20 boats being lifted up and down on hoists that are affixed to the dock and several people on the docks at the same time. (**Exhibit P**, p 28).

- Porter himself owns a 38 ft Express Cruiser that weighs 20,000 lbs and that Porter ties to the dock structure for support for the boat. (**Exhibit P**, pp 13-14).

- Lake of the Ozark is a rough lake and the roughest lake Porter has ever experienced, and Defendant allows 20,000lb boats to sit in this rough and turbulent water while tied to the dock structure. (**Exhibit P**, pp 13-14, 19).

- The Defendant admits to not offering any accommodation to Plaintiff to cover his boat. (**Exhibit P**, p 33). Defendant contends that Plaintiff should use the same cover *"as everyone else."*

Similarly, Defendant's property manager, Priest testified, as follows:

- All boat hoists are affixed to the dock structure; all hoists can be moving up and down at the same time; there is no restriction on boat weights; there is no restriction on tying boats off to the dock structure (even boats that weigh 20,000lbs+); and there is no restriction as to how many people may be on docks at one time. (**Exhibit F**, pp 16, 17, 23).

- The subject Boat Cover would only be an issue if several people had them. (**Exhibit F**, pp 30-32).

- Priest manages another property where Marine Concept Boat Covers are installed on docks with roofs, and have never caused damage. (**Exhibit F**, pp 24-25).

When taking Priest and Porter's testimony together, it is clear that Defendant's original position that the 130lb Boat Cover overstressed the dock was frivolous. On any given day, the dock structure supports the weight and stress of 20 boats that weigh 1,000s of pounds, on hoists moving in and out of the water at the same time, and several people that could total another several more 1,000s of pounds, in addition to the turbulent wave action from the lake. **This is equivalent thousands of pounds of loads on the dock on any given day.** The Defendant's position that the 130lb Boat Cover would cause failure was ridiculous.

Defendant's own expert, Doug Pluth, would not support its position, so Defendant fired Pluth, attempted to prohibit Pluth's deposition, and hired a new expert. The new expert's opinion is terribly flawed.

      i.    **There are a plethora of issues with Defendant's expert opinion. The most significant is that he did not even evaluate the subject**

**Boat Cover on the correct style of boat. The opinion should be disregarded.**

After Defendant realized its original position was frivolous, Defendant altered its position with a new concern – that the Boat Cover will cause the roof of the dock structure to fail. First, As discussed above, the Boat Cover system exerts nominal, if any, load on the roof. See above.

Second, Defense expert, Chad Williams ("Williams"), does not understand the difference between a center console boat and a catamaran boat, which is significant deficiency with his opinion. (**Exhibit Q**: Williams Transcript, pp 36-37). Williams entire report and analysis of wind loads on the Boat Cover and dock is based-on the cover being affixed to a center console boat. (**Exhibit Q,** pp 37, 54, 69). On pages 2 to 5 of William's Supplemental Report, Williams provides a sketch and photos of the Boat Cover on center console boats, and opines that the vertical section of the cover stretching from the rail of the boat to the roof of the dock will cause a sail effect and failure of the roof. (**Exhibit R**: Williams Report, pp 2-5). Williams confirmed at his deposition that his opinion and photographs are center console boats, not catamarans. (**Exhibit Q**, pp 37, 54, 69).

Below are two photographs taken directly out of Williams's report of the center console boats that he analyzed:



(**Exhibit R**, p 5). The Boat Cover on these boats are a completely different setup than Plaintiff. The reason is because center console boats have a hard-top roof that extend above the deck of the boat, which is why the cover (as shown above in William's report) extends vertically from the bow rail. Below is a photograph of the center console style that Defense expert incorrectly analyzed:



This is not in any way similar or relatable to the Boat Cover on a catamaran boat, like Jet, which lays flush onto the hull.

The significance of the forgoing is that Plaintiff's boat, Jet, is a catamaran, a low-profile canopy style boat where the Boat Cover fits snuggly to the entire hull of the boat. The only part of the Boat Cover on Plaintiff's boat that is extended above the hull is the patented windless system, which are windows where wind passes through the cover. (**Exhibit J; Exhibit M** – see photo of cover on catamaran, which is also in the brief above).

### F. Plaintiff's second and alternative request for accommodation

Notwithstanding Defendant's complete lack of any proof that the current Boat Cover system will harm the dock, Plaintiff, in an effort to satisfy Defendant's concern, requested approval to modify the track part of the system to remove any connection to the roof of the dock structure. The proposed re-design is attached hereto as **Exhibit S**. The redline in the photograph in **Exhibit S** is a 1X3 aluminum piece that will be installed horizontally from beam to beam, which is the

same beam where 20,000+lb boats tie-up to; and the three cables from the track to the roof purlin (the yellow line in photo) will be removed. This proposal removes any connection of the Boat Cover to the roof. Defendant denied this request. (**Exhibit T**: HOA denial).

Defendant's expert even admitted awareness that the residents of Cape Royale tie their boats weighing 1,000s of pounds to the beams of the structures for support. (**Exhibit Q**, pp 41-42). If the hoist fails, the dock structure will catch the weight of the boat. (**Exhibit Q,** pp 41-42). It is unexplainable and wholly discriminatory that the Defendant allows all residents to tie their boats to the beams of the structure, which poses loads of 1,000s of pounds, but refuse to allow a 130lb cover to be affixed to the same beam.

## G.   This Court already ruled that Plaintiff's right to equal use and enjoyment of his boat well is subject to FHA protection.

This Court issued an opinion in this matter stating in-part, as follows:

> *Plaintiff alleges Defendant's failure to make reasonable accommodation precludes Plaintiff from equal opportunity to use and enjoy his dwelling and boat well. (Doc. 1 at ¶ 67(d)) (emphasis added).* <u>***Plaintiff's allegation is consistent with the plain language of the FHA, which contemplates "equal opportunity to use and enjoy his dwelling" and "full enjoyment of the premises."***</u> *42 U.S.C.A. § 3604(f)(3)(b); § 3604(f)(3)(a).*

(**Exhibit U**: Opinion, pp 4-5).

The remaining issue at this stage is whether Defendant has failed to make a reasonable accommodation for Plaintiff to allow for equal use and enjoyment of the boat well, which it has failed to do.

## III.   STANDARD OF REVIEW

Under Rule 56, Summary Judgment is appropriate when there exists no genuine issue of material fact for trial. *Vette Co., v Aetna Cas. & Sur. Co*., 612 F.2d 1076, 1077 (Eight Cir. 1980). In considering a motion for summary judgment, the court is required to view the facts in the light

most favorable to the party opposing the motion and to give that party the benefit of all reasonable inferences to be drawn from the underlying facts disclosed in pleadings and affidavits filed in the case. *Id*.

## IV.   LEGAL DISCUSSION

### A.   Defendant, by its own admission, violated the FHA by failing to offer any accommodation to Plaintiff to allow Plaintiff equal opportunity and use of his boat well.

Discrimination for the purposes of section 3604(f) includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford handicapped persons equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B); s*ee also, City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 729 (1995); *Lloyd v. Housing Authority of City of Kirksville*, 58 F.3d 398, 399-400 (8th Cir. 1995); *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 333 (2d Cir. 1995); *United States v. California Mobile Home Park Management Co.*, 29 F.3d 1413, 1416-17 (9th Cir. 1994). The FHA prohibits discrimination against any person in the terms, conditions, or privileges in the provision of services or facilities in connection with such dwelling, because of a handicap … . 42 USC 3604(f)(2). The FHA requires that at the expense of the handicapped person, reasonable modifications of existing premises occupied by such person must be made if such modifications may be necessary to afford such person full enjoyment of the premises. 42 U.S.C. § 3604(f)(3)(a). The FHA is "a broad mandate to eliminate discrimination against and equalize housing opportunities for disabled individuals." *Community Housing Trust v. Department of Consumer and Regulatory Affairs*, 257 F. Supp. 2d 208, 221 (citing *Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir. 1995); *City of Edmonds v. Washington State Bldg. Code Council*, 18 F.3d 802, 806 (9th Cir. 1994), *aff'd, City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995); 42 U.S.C. § 3601. *See also Nevels v. Western World*

*Ins. Co., Inc.*, 359 F. Supp. 2d. 1110, 1119 (W.D. Wash. 2004). The language of the FHA is "broad and inclusive and must be given generous construction." *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1234 (U.S.D.C. of Columbia 1997); *Trafficante v. Metropolitan Life Inc., Co*., 409 U.S. 205, 209; 93 S. Ct. 364 (1972). The FHA's ant-discrimination provisions are intended to afford persons with handicaps equal opportunity to use and enjoy housing. *City of Edmonds,* 514 U.S. at 737.

The Eight Circuit has held that discrimination is regarded as the failure to fulfill an affirmative duty of reasonably accommodating a disabled individual's limitations. *Essling's Homes Plus, Inc., a Minn. Corp. v. City of St. Paul, a Minn. Corp*., 356 F.Supp.2d 971, 979; 29 NDLR P 213(2004). To succeed on summary disposition, the plaintiff must show that the requested accommodation is reasonable. *Id*. If plaintiff meets his burden, Defendant must prove special circumstances that demonstrate an undue hardship. *Id*.

Here, the Court has already ruled that the boat well is a facility in connection to Plaintiff's condo unit and covered by the FHA. (**Exhibit U**, pp 4-5). Also, to date, Defendant has not contested that Plaintiff Kirsten suffers from CMT, which is handicap qualifying for protection under the FHA. Notwithstanding the forgoing, **<u>Defendant, by its own admission, has not offered or even considered any accommodation for Plaintiff</u>**. (**Exhibit B**; **Exhibit P**, p 33). Defendant's position is that Plaintiff should use a standard cover like *"everyone else."* (**Exhibit P**, p 33). This is a blatant violation of the FHA. Plaintiff is not just like *"everyone else."* Plaintiff suffers from a debilitating disease that cripples his hands and feet. (**Exhibit B**). Plaintiff cannot walk around the hull of his boat and cover it like everyone else. (**Exhibit B**). In addition to lacking the motor skills to do this, if Plaintiff fell in the water while trying to cover the boat, he would drowned. (**Exhibit B**). Therefore, summary disposition is warranted on the issue that Defendant

has violated the FHA by refusing to make or even consider a reasonable accommodation to Plaintiff.

> ### i. Plaintiff has proffered substantial proofs that the Boat Cover is a reasonable accommodation request.

Under the FHA, Defendant is required to accommodate, at Plaintiff's expense, reasonable modifications of the boat well so that Plaintiff has full use and enjoyment of the same, like all other residents. This includes covering the boat, the same as all other residents. Plaintiff Kirsten paid for Marine Concepts to custom design the Boat Cover and install it into his boat well so that he can cover his boat, the same as all other residents. (**Exhibit B**). Three experts, with intimate familiarity of the Boat Cover, the boat - Jet, and subject dock, rendered opinions that this Boat Cover will not harm the integrity of the dock structure. (**Exhibit J; Exhibit K**, pp 14, 25, 31, 34, 36, 41-45, 59-60; **Exhibit M; Exhibit O**). Thus, Plaintiff has met his burden of proof and the requested accommodation should have been approved by Defendants.

The burden now shifts to Defendant to prove that the requested accommodation poses an undue hardship. Defendant cannot meet this burden. Defendant's intentional discrimination and desire to squeeze Plaintiff out of the complex is glaring. First, Defendant's used a fraudulent report as its original basis to prohibit the Boat Cover. The author of the report, Pluth, testified unequivocally that the report was used by Defendant without his knowledge and consent, and the report has no relation to this Boat Cover, boat, or dock. (**Exhibit I,** pp 7-8, 13, 15).

After the Pluth's report was proven to be misused, Defendant hired a new expert and altered its position that now the concern is the stress of the cover on the roof. This is also unsupported. Defendant's expert did not analyze this Boat Cover on the proper boat, Jet, which is a catamaran style boat. (**Exhibit Q; Exhibit R; also see photos above in the Statement of Facts**). Contrary to the center console used in Defendant's expert report, the subject Boat Cover wraps snuggly to

Jet; and the only part of the cover extending above the hull is the patented windless system. (**Exhibit J; Exhibit K**, pp 14, 25, 31, 34, 36, 41-45, 59-60; **Exhibit M; also see photos above in the Statement of Facts**).  After looking at the photographs, reasonable minds should conclude that the Boat Cover on Jet will not sail or parachute.  It is impossible.  The windless system are large windows that allow wind to pass through.  It cannot cause a sail or parachute.  (**Exhibit J; Exhibit K**, pp 14, 25, 31, 34, 36, 41-45, 59-60; **Exhibit M; Exhibit O; also see photos above in the Statement of Facts**).  Therefore, summary disposition should be granted in favor of Plaintiff to allow the Boat Cover to be used.

> ii.      **Plaintiff has offered to alter the track system for the Boat Cover so that it has no connection to the roof, which alleviates any of Defendant's stated concerns.**

Defendant has taken the position in this case that the Boat Cover will cause the roof to collapse because of three cables connect from the track to the roof purlins.  The subject cables are depicted in **Exhibit S**.  This is an unwarranted concern as the cables have nominal purpose and are mostly used to keep the track symmetrical.  To alleviate Defendant's concern, Marine Concept offered to remove the cables and completely detach the system from the roof, as shown in **Exhibit S**.  The system would attach only to the vertical dock beam, which is the same beam that supports 20,000+ lbs boats, as admitted by Porter and Defendant's expert.  (**Exhibit P,** p pp 13-14, 19; **Exhibit Q,** p 41-42).  Defendant denied this request without any valid reason, which is another violation of the FHA committed by Defendant.

> iii.      **Defendant has violated the FHA by refusing to amend its rules to allow for Plaintiff to use the subject Boat Cover.**

Defendant has a policy in its rules and regulations that prohibits all hanging boat covers.  This is a violation of FHA section 42 USC 3604(f)(2).  As discussed above, the Marine Concept cover is not like all other hanging boat covers.  The other covers do not have a patented windless

system. Porter admitted that the Defendant has not even considered the design of the Marine Concept cover:

> Q:     Mr. Porter, are you familiar with the patents that Marine Concepts has on their covers?
>
> A:     No.
>
> Q:     Are you aware that it has a patented system that allows wind to pass through the handing part of the cover so it does not parachute?
>
> A:     No.

(**Exhibit P**, p 38). Obviously, the Defendant denied the Boat Cover without even caring to understand how this cover works or doing any due diligence.

Furthermore, Porter testified that the concern is the weight of the cover "hanging from the roof." (**Exhibit P**, p 38). As discussed above, this is an unwarranted concern; and Plaintiff offered an alternative design to completely disconnect the Boat Cover from the roof. (**Exhibit S**). Defendant still refuses to amend its rules regulations to allow Plaintiff to use the Boat Cover; and therefore, violated the FHA.

**B.     Plaintiff should be awarded his attorney fees and costs.**

The prevailing party in FHA litigation may be awarded costs and reasonable attorney fees. 42 USC 3613 (c)(2); *Quigley v Winter,* 598 F.3d 938, 954 (Eight Cir. 2010).

Here, Plaintiff has established that Defendant knowingly and willfully committed three violations of the FHA: 1) Defendant refused to offer any accommodation to Plaintiff; 2) Defendant refused to approve either of Plaintiff's reasonable requests to modify the boat well; and 3) Defendant refused to amend its Bylaws to allow Plaintiff to use the Boat Cover. Taking this a step further, Defendant used a falsified report, disparaged and harassed Plaintiff with community wide

publications, and Defendant is making every effort to push Plaintiff out of the community over this accommodation request. Therefore, attorney fees are warranted.

To date, Plaintiff has been forced to incur $40,182 in attorney fees and costs in this matter, plus $5,950 in expert fees. (**Exhibit V**: Affidavit). Attached as **Exhibit V** is an affidavit addressing the undersigned's rate and hours worked, which are reasonable under the loadstar analysis.

## V. CONCLUSION

Consistent with the forgoing, Plaintiff respectfully requests that this honorable Court grant his motion, and enter an order in full or in part, as follows:

A. Defendant violated the FHA by refusing to offer or consider any accommodation for Plaintiff to have equal opportunity and use of his boat well.

B. Defendant violated the FHA by refusing to approve either of the proposals from Plaintiff to install the Boat Cover.

C. Defendant violated the FHA by refusing to amend its rules and allow use of the Boat Cover.

D. Award Plaintiff fees and costs in the amount of $46,132.

E. All other legal and equitable relief that this Court deems proper and just.

Respectfully submitted,

MADDIN, HAUSER, ROTH & HELLER, P.C.

*/s/John A. MacKenzie*
John A. MacKenzie (P80386)
Maddin, Hauser, Roth & Heller, P.C.
28400 Northwestern Highway
Suite 200 – Essex Centre
Southfield, MI 48034-1839
(248) 354-4030
jmackenzie@maddinhauser.com
*Attorneys for Plaintiff*

Dated: July 31, 2023

03845909 v1

22

**PROOF OF SERVICE**

     I hereby certify that on **July 31, 2023,** I electronically filed the above documents and this Proof of Service with the Clerk of the Court using the CM/ECF E-Filing system, which will send notification of such filing to those who are currently on the list to receive e-mail notices for this case.

MADDIN HAUSER ROTH & HELLER, P.C.


By: */s/ Bernadette Bartoy*
      Bernadette Bartoy